**NOT FOR PUBLICATION**                                         **CLOSED**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| THOMAS W. MILLS, | Hon. Faith S. Hochberg |
| Petitioner, | Civil Case No. 09-5987 (FSH) |
| v. | **OPINION & ORDER** |
| DONALD MEE, *et al.*, | Date: January 11, 2011 |
| Respondents. | |

**HOCHBERG, District Judge**.

### I.  INTRODUCTION

Petitioner Thomas W. Mills, a prisoner currently confined at East Jersey State Prison in Rahway, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He contends that his July 18, 1996 conviction and August 15, 1996 sentence for first degree aggravated manslaughter and second degree possession of a handgun for unlawful purposes was contrary to the Fifth, Sixth, and Fourteenth Amendments.  The Respondents are Administrator Donald Mee and the Attorney General of New Jersey.

### II.  BACKGROUND

**A.  Factual Background**

This case arises from an August 15, 1995 confrontation between Petitioner and Isaac Buie outside the complex at Seth Boyden Terrace and Center Terrace in Newark, New Jersey.  During the confrontation, Buie suffered a fatal gunshot wound.

1

Petitioner's version of events, taken from a statement he gave to police, is as follows:

Petitioner was installing new locks for a customer when he went to check on his van. (Ex. C 158:5-11)  Upon returning, he noticed that one of his tools was missing from the hallway. Id.  He was then informed that Buie was around the corner trying to sell the tool.  (Ex. C 158:14.) Buie's description matched that of an individual who had previously made remarks to Petitioner about items in his van.  (Ex. C 158:19-24.)  When Petitioner confronted Buie and demanded that he return his property, Buie responded by pulling Petitioner towards him and simultaneously reaching into his wasteband and pulling "something" out.  (Ex. C 159:12-16.)  Petitioner thought Buie had a knife or gun and a struggle ensued.  (Ex. C 159:17-19.)  Petitioner was hit several times on the side and the gun started "going off at the same time."  (Ex. C 159:20-21.)  Petitioner said that Buie "still had [the gun] in his hand" when Petitioner left the scene.  (Ex. C 161:11-12.) Petitioner's statement was admitted into evidence.  At trial, it was Petitioner's theory that he did not bring the gun to the scene, and that he was trying to defend himself from Buie when the gun discharged.  (Petitioner's Br. 3.)

On the day of his death, Buie was accompanied by Pamela Henderson, who testified at trial and gave the following version of events:

Henderson and Buie were trying to acquire funds to purchase drugs.  They had already used cocaine with Buie's girlfriend when they noticed Petitioner's van parked at the complex at Seth Boyden Terrace and Center Terrace.  (Ex. C 59:9-61:15.)  They knew the van belonged to Petitioner because they had seen it parked there on other occasions.  (Ex. C 61:16-19.) Henderson and Buie saw Petitioner talking to a group of men across the street from his van.  (Ex. C 62:9-14.)  Petitioner gave some money to the one of the men, who departed and returned

shortly and handed something to Petitioner.  (Ex. C 64:13-20.)  Buie told Henderson that he believed Petitioner had some money.  He went to Petitioner's van and removed a toolbox, which he proceeded to dangle in front of Petitioner.  (Ex. C 65:1-21.)  When Petitioner asked for his toolbox back, Buie told him that he would return it for $5.  (Ex. C 66:2-15.)  Petitioner went to his van, retrieved a .25 caliber handgun, "brought it up toward [Buie]," and asked for his property back once again.  (Ex. C 66:16-68:6.)   Buie tried to knock the gun out of Petitioner's hand with the toolbox, and the gun went off.  (Ex. C 68:15-21.)  Buie retreated to some nearby dumpsters, but Petitioner continued to fire shots at him.  (Ex. C 70:3-16.)  While holding his side, Buie asked, "Why you doing this to me, man?" before collapsing face down.  (Ex. C 70:21-72:2.)  Petitioner got in his van and left the scene.  (Ex. C 71:21-22.)

Another witness, Ellen Fay Black, also observed the altercation between Petitioner and Buie and testified at trial.  She testified that she was in her car nearby, listening to music while waiting for her girlfriend, when a confrontation between a white man (Petitioner) and a black man (Buie) caught her attention.  (Ex. C 111:15-113:11.)  She heard a gunshot (Ex. C 114:21-22.), and, looking back at the men, noticed the white man pointing a small gun at the black man.  (Ex. C 114:23-115:13.)  The white man then fired another shot at the black man, who was trying to move out of the way.  (Ex. C 115:14-24.) The men started "wrestling" and the black man grabbed at the gun, but the white man pushed him away and fired at him again.  (Ex. C 115:25-116:15.)  The black man then "grabbed his side," yelled, "Why is you doing this to me?" and ran towards nearby dumpsters.  (Ex. C 116:16-117:8.)  The white man then fired another shot over the dumpsters.  (Ex. C 117:9-13.)  As the black man then fell (Ex. 117:15), the white man got

3

into his van and drove away. (Ex. C 117:24-118:3.) Another man, who was sitting in the passenger's seat, laughed as the van left the scene. (Ex. C 118:9-21.)

Bonito Vasquez, who occasionally worked for Petitioner, also claimed to have witnessed the events in question. He testified at trial that he could not sleep on the night of August 15, 1995, and so he went outside, where he discovered Petitioner and Buie arguing on the corner. (Ex. E 4:13-20.) He saw Buie take out a gun, and then he heard one gun shot, causing him to run away. (Ex. E 6:10-18.) His testimony was in conflict with a statement he had given to police, in which he claimed to have heard "a couple of gunshots." (Ex. E 18:1-20:2.)

There was conflicting testimony by expert witnesses regarding the distance between Petitioner and Buie when the fatal shot was fired. The State's expert, who testified as a rebuttal witness, opined that the two men were ten inches apart (Ex. E 90:23-91:7), while Petitioner's expert estimated that the distance was between two and three inches. (Ex. D 62:24-63:4.)

**B.     Procedural Background**

An Essex County Grand Jury returned a three-count indictment against Petitioner on October 3, 1995, charging him with: (1) purposeful or knowing murder, contrary to N.J. Stat. Ann. § 2C:11-3(a)(1) or (2); (2) third degree unlawful possession of a firearm, contrary to N.J. Stat. Ann. § 2C:39-5(b); and (3) second degree possession of a handgun for unlawful purposes, contrary to N.J. Stat. Ann. § 2C:39-4(a).

The Honorable Paul J. Vichness, J.S.C., heard pretrial motions on July 10 and 11, 1996, and a jury trial commenced before him on July 12, 1996. On July 18, 1996, the jury found Petitioner guilty of first degree aggravated manslaughter (as a lesser included offense of murder)

4

and second degree possession of a handgun for unlawful purposes.  He was acquitted on the unlawful possession of a firearm charge.

Petitioner went before Judge Vichness for sentencing on August 15, 1996.  Judge Vichness granted the State's motion to have Petitioner sentenced as a persistent offender, and he sentenced Petitioner to an extended term of forty years in prison with twenty years parole ineligibility.  Petitioner's conviction for unlawful possession of a firearm was merged into his conviction for aggravated manslaughter.  He was assessed applicable penalties and fines and was awarded credit for the time he had already spent in custody.

Petitioner filed a Notice of Appeal with the Appellate Division, which affirmed his conviction and sentence in a *per curiam* opinion dated March 2, 1998.  (Petitioner's Br. Ex. A.) The New Jersey Supreme Court denied Petitioner's petition for certification on June 2, 1998. (Petitioner's Br. Ex. B)  On May 6, 2005 Petitioner filed a petition for post-conviction relief ("PCR"), which Judge Vichness denied, following a hearing, on October 18, 2005.  (Ex. M Da46.)  Petitioner appealed to the Appellate Division, which affirmed Judge Vichness's denial of PCR in a *per curiam* opinion dated July 25, 2008.  (Petitioner's Br. Ex. C.)  The Supreme Court of New Jersey denied Petitioner's petition for certification on January 16, 2009.  (Petitioner's Br. Ex. D.)

**C.      Petitioner's Claims**

Petitioner filed this habeas petition asserting the following grounds for relief:

1. Ineffective Assistance of Counsel, as Petitioner's lawyer (1) failed to investigate the State's witness Henderson and (2) failed to object to the State's use of an expert rebuttal witness.

5

2. Due Process and Fair Trial rights violations, contrary to the Fifth, Sixth, and Fourteenth Amendments, as the trial court improperly permitted the State (1) to call an expert witness on rebuttal, and (2) to call Henderson as an eleventh-hour witness without prior notice to the Defense.

3. Due Process and Jury Trial rights violations, contrary to the Fifth, Sixth, and Fourteenth Amendments, as Petitioner was impermissibly sentenced to an extended term.

It appears that Petitioner's claims have been exhausted in the state courts.

### III.  DISCUSSION

A.  **Habeas Corpus Standard of Review**

A petition for a writ for habeas corpus is submitted under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, which provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court

confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09.  To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable.  See id. at 409.  In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts.  See Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

**B.     Ineffective Assistance of Counsel (Ground 1)**

Petitioner claims in Ground One that he was denied effective assistance of counsel because his attorney: (1) failed to investigate the State's witness Henderson before she testified at

7

trial, when a proper investigation would have "completely discredited her testimony" (Petitioner's Rep. Br. 8); and (2) failed to object to the State's use of an expert rebuttal witness without proper notice (Petitioner's Br. 11-12.)

The Supreme Court set forth the standard for ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, a petitioner seeking to prove a Sixth Amendment violation must demonstrate, based on the facts of the case at the time of his counsel's conduct, that counsel's performance fell below an objective standard of reasonableness.  See id. at 688-89; Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005); Keller v. Larkins, 251 F.3d 408, 418 (3d Cir. 2001), cert. denied, 534 U.S. 973 (2001).  Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 687.  The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (internal citations omitted); see also Virgin Islands v. Wheatherwax, 77 F.3d 1425, 1431 (3d Cir. 1996), cert. denied, 519 U.S. 1020 (1996).

If able to demonstrate deficient performance by counsel, the petitioner must also show that counsel's substandard performance actually prejudiced his defense.  See Strickland, 466 U.S.

8

at 687; see also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.  Prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.  The reviewing court must evaluate the effect of any errors in light of the totality of the evidence.  See id. at 695-96.

      1.     *Failure to Investigate*

Petitioner claims that counsel's failure to investigate Henderson's background resulted in her testimony not being discredited.  (Petitioner's Rep. Br. 8.)  He asserts that at the very least, he is now entitled to an evidentiary hearing to determine why counsel did not properly handle Henderson as a witness.  (Petitioner's Rep. Br. 2-3.)

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary." Strickland, 466 U.S. at 691.  A particular decision by counsel not to investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id.  Furthermore, "the exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case or failed to interview essential witnesses or to arrange for their attendance." Moore v. United States, 432 F.2d 730, 739 (3d Cir. 1970).

It is evident from the trial transcript that counsel elicited a number of damaging facts on cross-examination.  For example, during cross-examination, counsel elicited testimony from Henderson about her smoking of crack cocaine "off and on throughout the day" of the shooting (Ex. C 91:4-7); her being "in the process of going to hustle up some money" with Buie to buy

9

more drugs when the shooting occurred (Ex. C 94:22-24); her uncertainty as to the time frame leading up to the shooting (Ex. C 98:10-24); her inability to state who she was talking to at the scene prior to the shooting (Ex. C 100:13-101:7); her uncertainty as to her position and the positions of others at the scene (Ex. C 97:16-104:22); and her close friendship with the Buie family (Ex. C 107:2-108:3).  Judge Vichness noted counsel's "vigorous" cross-examination of Henderson during the PCR hearing.  (Ex. I 16:13.)  Petitioner also notes that counsel touched on these same credibility issues in her summation and closing, during which she called Henderson a "liar" and submitted that she had "nodded out" on the stand.  (Petitioner's Br. 7.)  Moreover, Petitioner has not identified any facts prejudicial to the defense that should have, and, upon further investigation would have, been uncovered.

Ultimately, Henderson's credibility was an issue for the jury.  Although Petitioner claims that further investigation on counsel's part would have completely discredited Henderson, he fails to state what additional measures, short of getting Henderson to admit that she was lying, counsel should have employed to discredit her.  Upon review of the record in light of the Strickland standard, counsel's performance in discrediting Henderson was not objectively unreasonable under the circumstances.

   2.   *Failure to Object*

Petitioner also claims that counsel was ineffective because she did not object when the State proffered Det. Lt. Prystauk, a ballistics expert, as a rebuttal witness following the testimony of Petitioner's ballistics expert.  (Petitioner's Br. 11.)  Prystauk testified that based on a shooting experiment he performed, Buie was shot from "at least ten inches" away – not from three inches away, as Petitioner's expert had concluded.  (Ex. E 91:7.)

10

Although counsel did not move to bar the State from calling Prystauk at trial, she subjected him to a thorough cross-examination in order to cast doubt upon the validity of his test results.  For example, she got Prystauk to admit that gun powder residue on Buie's shirt could have been lost over the course of time or because the shirt was handled by police (Ex. E 93:3-6); his experiment did not take into account weather conditions such as wind (Ex. E 94:7-13); the gun and powder he used for his experiment may not have been the type used by the shooter (Ex E 96:11-97:3); and he did not perform an additional experiment from three inches away, the range at which Petitioner's expert said the shooting took place (Ex. E 97 6-7).  Furthermore, counsel objected, albeit unsuccessfully, to the State's attempt to enter the results of Prystauk's experiment into evidence, arguing that the fabric and gun used for the experiment were only demonstration pieces that could confuse the jury.  (Ex. E 87:20-88:7.)

Under Strickland, Petitioner must overcome the presumption that, under the circumstances, the challenged action – in this case, not moving to bar the testimony of a rebuttal witness – was a "sound trial strategy."  466 U.S. at 689.  As Petitioner makes no showing that counsel's strategy of thoroughly cross-examining Prystauk and calling his methods into question was not "sound," he has not overcome this presumption.  Nor has petitioner demonstrated that a motion to bar a witness from testifying (as distinguished from a thorough cross-examination of that witness) would have had any realistic chance of succeeding.  That is particularly true because the Appellate Division subsequently held that it was not error, under New Jersey evidentiary rules, for the trial court to have admitted the testimony. (*See* Petitioner's Brief, Ex. C at 4.) Finally, Petitioner has in no way demonstrated that but for counsel's decision, the result of the

trial would have been different. Id. at 694. Counsel's decision not to move to bar the State from calling Prystauk as a rebuttal witness did not amount to ineffective assistance of counsel.

**C.     Due Process (Ground 2)**

Petitioner asserts that his Due Process rights were violated because the trial judge: (1) permitted Henderson to testify without prior notice (Petitioner's Rep. Br. 2); and (2) allowed the State to use an expert rebuttal witness without prior notice. (Petitioner's Br. 9.)

Both of Petitioner's claims involve alleged violations of state evidence rules. Under federal law, it is well-established that the violation of a right created by state law, without more, is not cognizable as a basis for federal habeas relief, as "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (explaining that "federal habeas corpus relief does not lie for errors of state law") (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)). Accordingly, a petitioner cannot obtain relief for any errors in state law evidentiary rulings, unless they rise to the level of a deprivation of due process. See Estelle, 502 U.S. at 70 (explaining that "the Due Process Clause guarantees fundamental elements of fairness in a criminal trial") (quoting Spencer v. Texas, 385 U.S. 554, 563-64 (1967)). For a habeas petitioner to prevail on a claim that an erroneous evidentiary ruling amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial. See Keller v. Larkins, 251 F.3d 408, 413 (3d Cir. 2001), cert. denied, 534 U.S. 973 (2001).

1.     *Testimony of Henderson*

Petitioner claims that Henderson's name and statement were not supplied to the defense during the discovery period, in violation of Discovery Rule 3:13-3(c)(6), which provides that the

12

prosecutor shall permit the defense to view the "names, addresses, and birthdates of any persons whom the prosecutor knows to have relevant evidence or information including a designation by the prosecutor as to which of those persons may be called as witnesses." Petitioner further asserts that even if Henderson's information was provided to the defense, his counsel never informed him of that fact.

The record indicates that Petitioner's counsel received two letters from the State before trial regarding Henderson as a potential witness. The first, dated May 1, 1996, notified counsel that the State had met with Henderson and included what information Henderson had provided. (Ex. I 5:14-16.) The second, dated July 8, 1996, notified counsel of additional information later provided by Henderson. (Ex. I 5:16-18.) Furthermore, the Appellate Division noted that "according to the judge, Henderson's name and the substance of her testimony were sent to defense counsel prior to trial." (Petitioner's Br., Ex. C at 4.) Accordingly, it appears that, at a minimum, Petitioner's counsel was on notice that Henderson was a potential witness.[1] Petitioner has not satisfied his burden to prove that the trial court's decision to permit Henderson's testimony denied him a fundamentally fair trial.

2.  *Testimony of State's Expert*

---

[1] The Court also notes that there were allegations in the July 8, 1996 letter from the State to Petitioner's counsel that Petitioner had contacted Henderson and told her to make herself unavailable during the week of the trial. (Ex. I 18:3-13.) Although these allegations cannot be substantiated, they suggest that Petitioner knew Henderson was going to testify at his trial. In any event, Petitioner has failed to explain how his knowledge, as opposed to his counsel's knowledge, of Henderson being a potential witness would have altered the outcome of the trial in any way.

Petitioner claims that Prystauk should not have been permitted to testify because the State did not fulfill the obligations imposed by Rule 3:13-3(c)(9), which provides that the prosecutor shall permit the defendant to inspect and copy:

> [the] names and addresses of each person whom the prosecutor expects to call to trial as an expert witness, the expert's qualifications, the subject matter on which the expert is expected to testify, a copy of the report, if any, of such expert witness, or if no report is prepared, a statement of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.  Except in the penalty phase of a capital case if this information is requested and not furnished 30 days in advance of trial, the expert witness may, upon application by the defendant, be barred from testifying at trial.

Petitioner alleges that since he was not given notice in advance that Prystauk was going to testify as an expert witness, the trial judge should have barred Prystauk from testifying at trial. (Petitioner's Br. 11.)

Petitioner fails to take into account how a rebuttal witness differs from a witness used during the State's case-in-chief.  Judge Vichness, during the PCR hearing, described this difference in the context of Petitioner's claim:

> ...the defense brought an expert from out of state and the question was, based on the stippling, an estimate of how far away the shot was, and Lieutenant [Prystauk] was then brought in to say that the experts' testimony was wrong and that it was a different distance than that expert said.  There is no way the State could, without hearing the testimony of the defense's expert, say, I'm going to use a rebuttal witness or I'm not going to use [a rebuttal witness].  Rebuttal, by its very nature, is somebody who the State didn't use as a part of its case-in-chief, and only used to rebut testimony that was put in front of the Court.

(Ex. I 15:15-16:3.)  As Judge Vichness noted, the State could not have given Petitioner advance notice that it was going to call Prystauk, as Prystauk's rebuttal testimony only became necessary after Petitioner's expert took the stand and gave his opinion as to the shooting.  In other words, Prystauk's testimony was a direct result of the testimony of Petitioner's expert.  The Appellate

Division also acknowledged this fact by simply noting that "Prystauk was a rebuttal witness. He was called to testify to rebut expert testimony offered by defense expert." (Petitioner's Br., Ex. C at 4.)

The Federal Rules of Criminal Procedure illuminate this difference by requiring the State to provide "written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence *during its case-in-chief at trial*. Fed. R. Crim. P. 16(a)(1)(G) (emphasis added). Courts have consistently held that rebuttal evidence need not be disclosed by the State under Fed. R. Crim. P. 16. See United States v. Silva, 141 F. App'x 521, 523 (9th Cir. 2005) (government is not required to give notice of expert rebuttal testimony); see also United States v. Delia, 944 F.2d 1010, 1018 (2d Cir. 1991) (prosecution was not required to disclose rebuttal evidence in order to help defense decide whether to pursue a line of questioning); see also United States v. Windham, 489 F.2d 1389, 1392 (5th Cir. 1974) (failure to disclose the names of two rebuttal witnesses was not prejudicial error). Thus, it was not a violation of a federally protected right for the state to call Lt. Prystauk as a rebuttal expert without prior notice.

Given this set of circumstances, and the fact that counsel cross-examined Prystauk to test the validity of his experiment, the Court finds that Petitioner was not denied his right to due process or a fair trial when Prystauk was permitted to testify.

**D.     Extended Sentence (Ground 3)**

Petitioner argues that New Jersey's sentencing procedures for discretionary extended sentencing under the persistent offender statute violate the Fifth, Sixth and Fourteenth Amendments. In State v. Dunbar, 108 N.J. 80 (1987), the New Jersey Supreme Court established

the criteria required for the imposition of an extended sentence under N.J. Stat. Ann. § 2C:44-3(a). "First, the sentencing court must determine whether the minimum statutory predicates for subjecting the defendant to an extended term have been met." Id. at 89. A sentencing court may impose an extended term if the defendant is being sentenced for a crime of the third degree or higher and is a persistent offender. N.J. Stat. Ann. § 2C:44-3(a). "A persistent offender is a person who at the time of the commission of the crime is 21 years of age or over, who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he was at least 18 years of age, if the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within 10 years of the date of the crime for which the defendant is being sentenced." Id. Petitioner satisfies these prerequisites.[2]

"Second, the court must determine whether to impose an extended sentence. Third, it must weigh the aggravating and mitigating circumstances to determine the base term of the extended sentence. Finally, it must determine whether to impose a period of parole ineligibility." Dunbar, 108 N.J. at 89.

This sentencing scheme, specifically the second and third steps, came under scrutiny after the Supreme Court's ruling in Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), which requires any fact, other than the fact of prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum, to be submitted to a jury and proved beyond a reasonable doubt.

---

[2] Though Petitioner argues that the State could not produce certifications substantiating several of the convictions they allege, he does not actually contest his status as a persistent offender. The sentencing court noted that Petitioner was convicted of indictable weapons offenses in 1977 and 1993. (Ex. H 10:21-23.) Petitioner's counsel conceded his criminal history at the sentencing but characterized his previous offenses as "drug driven type of crimes." (Ex. H 14:2-3.)

The Supreme Court later clarified "that 'the statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of facts reflected in the jury verdict or admitted by the defendant*." Blakely v. Washington, 542 U.S. 296, 303 (2004) (emphasis in original).

Petitioner contends: (1) the extended sentence was based solely on a judicial finding of aggravating factors and was imposed in violation of Apprendi and Blakely, (Petitioner's Br. 21.); and (2) notwithstanding the validity of the New Jersey sentencing scheme under Apprendi and Blakely, the sentencing court misapplied Dunbar by improperly weighing the aggravating and mitigating circumstances when making its base term determination. (Petitioner's Br. 13-21.)

    1.    *Apprendi & Blakely*

Petitioner argues that the Supreme Court's decisions in Apprendi and Blakely invalidate his extended sentence retroactively. That argument is unavailing. To establish that petitioner was subject to an extended sentence as a "persistent offender" under the meaning of N.J. Stat. Ann. § 2C:44-3(a), the Court took notice of Petitioner's prior convictions. (Ex. H 19:9-20.) A court may take notice of prior convictions at sentencing. See Apprendi, 530 U.S. at 490. The sentencing court also took notice of the facts of Petitioner's conviction, as found by the jury. (Ex. H 21:20-23.) Consequently, the sentencing court was permitted to impose a sentence within the extended range. See Blakely, 542 U.S. at 304 (the allowable sentence is up to "the maximum [the sentencing judge] may impose *without* any additional findings [of fact]") (emphasis in original). The extended term for first-degree aggravated manslaughter is between 30 years and life imprisonment. N.J. Stat. Ann. § 2C:43-7(a)(1). Petitioner was sentenced to 40 years in prison, which is within the extended range.

Although the sentencing court considered other aggravating and mitigating factors during sentencing, that alone does not render the sentence invalid. A fact considered at sentencing must be submitted to a jury if it "increases the penalty for a crime beyond the prescribed statutory maximum." Blakely, 542 U.S. at 310 (quoting Apprendi, 530 U.S. at 490). The sentencing court had the discretion to impose a sentence of up to life in prison on Petitioner as a persistent offender. The record reflects that the court considered aggravating and mitigating factors to select the appropriate sentence within that range.[3] (Ex. H 66:5-17.) Accordingly, Petitioner's sentence did not violate Apprendi or Blakely.[4]

2.  *Aggravating and Mitigating Factors*

Petitioner contends that the court erred by improperly weighing aggravating and mitigating factors when imposing the extended sentence under New Jersey's sentencing scheme. (Petitioner's Br. 16-21.) Petitioner cannot obtain *habeas* relief for an error in state law, unless

---

[3]  The sentencing court found that "the aggravating factors preponderating over the mitigating factors are more applicable towards a period of parole ineligibility" than an increase in the base sentence. (Ex. H 66:11-14.)

[4]  Even if Petitioner's sentence violated Apprendi and Blakely, it is unlikely that they would render his sentence invalid retroactively. The Third Circuit has held that Apprendi is not applicable retroactively on collateral review. See United States v. Swinton, 333 F.3d 481, 490-91 (3d Cir. 2003). The Third Circuit has also commented that because Blakely simply applied Apprendi to a different statutory scheme, it follows that it, too, would not apply retroactively. See Reinhold v. Rozum, 604 F.3d 149, 154 n.4 (3d Cir. 2010).

This result is in accord with the New Jersey Supreme Court's holding in State v. Natale, 184 N.J. 458 (2005). In Natale, the court held that New Jersey courts should apply Blakely retroactively to cases in the "pipeline" – *i.e.*, to "defendants with cases on direct appeal as of the date of [the] decision and to those defendants who raised Blakely claims at trial or on direct appeal." Natale, 184 N.J. at 494. Petitioner's case was not in the "pipeline" at the time of the Natale decision. His conviction was affirmed by the appellate division in 1998, and his petition for certification to the New Jersey Supreme Court was denied later that year.

the error is so grave that it constitutes a deprivation of a federal right.  See Estelle, 502 U.S. at 67-68.

The court found that the aggravating factors preponderated over the mitigating factors and sentenced Petitioner to forty years of imprisonment with twenty years of parole ineligibility.  The sentencing court found, as mitigating factors, (1) the imprisonment of the defendant would entail excessive hardship to defendant and his dependents; and (2) to a limited extent, the victim's conduct induced or facilitated the defendant's conduct.  (Ex. H 61:8-62:18.)  Elaborating on the second mitigating factor, the court concluded "While I don't find that [the victim's conduct] induced [the defendant's conduct] or facilitated it it did play a role in it and I think that that has to be taken into account."  (Ex. H 61:8-11.)  As aggravating factors, the sentencing court found (1) the substantial risk that defendant would commit another offense; (2) the extent of the defendant's prior criminal record and the seriousness of the convicted offenses; and (3) the need to deter others from violating the law.  (Ex. H 64:23-65:2.)

Petitioner contends that the court should have weighed several additional mitigating factors at sentencing.  The sentencing court considered each of the mitigating circumstances now asserted by Petitioner and gave specific reasons for rejecting them.  First, Petitioner argues that he did not contemplate that his conduct would cause or threaten serious harm. (Petitioner's Br. 17.)  The court did not believe this claim, finding overwhelming evidence that Petitioner went to his truck, got his gun and shot at Isaac Buie repeatedly.  (Ex. H 60:9-18.)  The court concluded, "How someone could take a gun and shoot it not once but multiple times and not contemplate that his conduct would cause or threaten serious harm, I don't understand." (Ex. H 60:15-18.) Second, Petitioner argues that he acted under strong provocation. (Petitioner's Br. 18.)  On this

19

issue, the court concluded, "[T]heft of tools does not provoke taking someone's life." (Ex. H 60:21-22.) Lastly, Petitioner argues that the court should have considered that his conduct was the result of circumstances unlikely to recur. (Petitioner's Br. 18.) The court found that, considering the defendant had previously been unable to stay out of trouble and that he was admittedly a drug addict, the circumstances were likely to recur. (Ex. H 61:24-62:7.) The court's balancing of the aggravating and mitigating factors was certainly not so unreasonable as to deprive Petitioner of due process or some other federal right.

## IV.  CONCLUSION AND ORDER

For the reasons set forth in this opinion, the petition for a writ of habeas corpus is **DENIED**.  The certificate of appealability is **DENIED**.  This case is **CLOSED**.

      /s/ Faith S. Hochberg  
      Hon. Faith S. Hochberg, U.S.D.J.